**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

PAYMENTECH, LLC,

        Plaintiff,

vs.

                                   **CASE NO. 8:10-cv-02195-T27-AEP**

CARL NAPOLI, JERRY NAPOLI,
STEVE VICKERS, JAMIE BULLARD,
and iTeamSolutions, LLC,

        Defendants.

_____

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION,
WITH MEMORANDUM OF LAW**

      Plaintiff, Paymentech, LLC, pursuant to FED. R. CIV. P. 65(b), and M. D. Fla. L.R. 4.05, moves for the entry, after notice and hearing, of a preliminary injunction, against Defendants, Carl Napoli, Jerry Napoli, Steve Vickers, James Bullard, and iTeamSolutions, LLC, to enforce its rights to protect its confidential, trade secret, and proprietary information.  The grounds for this motion are set forth below pursuant to M.D. Fla. L.R. 4.05(b)(2)-(4).

**MEMORANDUM OF LAW**

**I.      INTRODUCTION**

      By this action and this motion, Plaintiff Paymentech, LLC ("Paymentech" or the "Company") seeks to enforce its rights to protect its confidential, trade secret, and proprietary information.  Defendants, Carl Napoli, Jerry Napoli, Steve Vickers, and James Bullard (collectively the "Individual Defendants") are former employees of

Paymentech.   Defendants Carl Napoli, Jerry Napoli, and Vickers are owners or principals of Defendant iTeamSolutions, LLC.

The Company, along with Paymentech Solutions, LLC, is a subsidiary of JPMorgan Chase, and a global leader in payment processing, maintains proprietary platforms that provide access to a wide variety of payment methods, such as credit cards, debit cards, prepaid stored value cards and electronic check processing.  For the reasons discussed below, the Company is aware of numerous violations of its codes and policies by the Individual Defendants, indicative of Defendants' misappropriation of valuable, highly sensitive, confidential and proprietary information, and trade secrets regarding Paymentech's business and operations, including but not limited to the Company's top secret source code which supports its core business functions.

As the Individual Defendants' activities began to come to light, Paymentech investigated, reminding the Individual Defendants of the Company's policies with respect to employee conduct, conflicts of interest, outside business operations, non-solicitation of employees and business, technology usage, and IT Risk Management (the "Policies").  Defendant iTeamSolutions was similarly put on notice of its duty not to possess the Company's trade secrets, confidential and proprietary information.  As demonstrated in this motion, Paymentech suffers ongoing and continuing irreparable and actual injury to its legitimate business interests, principally its proprietary information and trade secrets in an amount that is impossible to ascertain unless the Defendants are enjoined from the aforementioned conduct, including any use or disclosure of the Company's confidential, proprietary, and trade secret information.  The Florida legislature, and both federal and state courts in Florida, have consistently

recognized that a preliminary injunction is the only remedy adequate to prevent the irreparable harm that will otherwise and inevitably follow from the Individual Defendants' blatant breach of Company Policies, and all Defendants' continued misappropriation of the Company's confidential information.

## II.     STATEMENT OF FACTS

### A.     <u>Company Overview</u>

1.      Paymentech and its affiliates (referred to collectively as "the Company"), are subsidiaries of JPMorgan Chase, and a global leader in payment processing and merchant acquiring, capable of authorizing transactions in more than 130 currencies. The Company's proprietary platforms provide access to a wide variety of payment methods, such as credit cards, debit cards, prepaid stored value cards and electronic check processing.  The Company processes billions of transactions each year, including an estimated half of all global internet transactions.  *See attached Declaration of George White, at Exhibit "A."*

2.      The Company also provides a full set of solutions aimed at accelerating cash flow and managing transaction data.  On the internet or at the point of sale, the Company has researched and developed a unique combination of innovative service and solutions for merchants.  *See Exhibit "A."*

3.      As part of its business, the Company has developed a sophisticated and complex source gateway code called the Orbital Code (hereinafter referred to as "code").  The Orbital Gateway is one of the fastest growing aspects of the Company's business.  The code allows e-commerce merchants to obtain payment from end-users by obtaining the authorization, settlement and payment from their customers.  The Orbital Gateway is what "sits" between the Internet and the Company's proprietary

systems, such as Stratus® and Tandum®.  The code is secret, but adaptable, even in portions.  The code could even be used in new industries to gain an unfair competitive advantage.  *See Exhibit "A."*

4.      In addition to millions of dollars of actual research and development cost, the Company has invested significant amount of technological resources and manpower over the past decade to enhance the code and adopt it to specific industries, making it invaluable.  *See Exhibit "A."*

5.      The Company has strict compliance policies which protect the highly confidential and proprietary nature of its information, including all code.  Employees are instructed that:

> You may have access to confidential information related to the firm's business . . . You may not, either during your period of service or thereafter, directly or indirectly, use or disclose to anyone any such confidential information, except as permitted by the Code [of Conduct] and other policies applicable to you.

Section 3.1 of Code of Conduct.  *See attached Declaration of Rebecca Bell, at Exhibit "B," attaching true and correct copies of the IT Risk Management Policy, the Code of Conduct, and the Technology Usage Policy, as well as copies of the Individual Defendants' affirmations of the Code of Conduct.*

6.      Additionally, the Company's IT Risk Management Policy (Section 11.1) mandates:

> External publication, distribution, or dissemination, in any medium, including via electronic media, of JPMorgan Chase-owned information requires prior approval from the Information Owner(s), the applicable Senior Business Executive or designee, and Senior Corporate Marketing and Communications Executive or designee.

> Access to JPMorgan Chase's information resources must be granted to authorized Users only and Users must be authorized in accordance with

processes described in IT Risk Management Policies and Standards and other corporate policies.

Access to JPMorgan Chase information resources must be commensurate with and aligned to the User's job function, role, and responsibilities.

All access to and use of JPMorgan Chase information resources must be for authorized purposes only.

IT Risk Management Policy, § 11.1.  *See Exhibit "B."*

7.     The Company also requires that *only company-owned or authorized equipment may be used to store Company software and data, and that the employee's personal equipment may not be used to store Company software and data.*  IT Risk Management Policy, §2.0(6) [emphasis added].  *See Exhibit "B."*

8.     Further, to prevent any conflict of interest or potential for disclosure or misuse of Company assets, employees are prohibited from any outside employment, consultation, or similar activity for which they will be paid unless they receive pre-clearance from the Company.  *See Exhibit "B."*

9.     These policies applied to each of the Individual Defendants and each acknowledged receipt of these policies at the time they were hired.  *See Exhibit "B."*

**B.     The Individual Defendants' Employment With the Company**

10.     iTeamSolutions is a venture owned by Defendants Carl Napoli, Jerry Napoli, and Vickers, among others.  *See attached Declaration of Mike Nicholls, at Exhibit "C."*

11.     Prior to becoming full-time employees of the Company, Defendants Carl Napoli and Jerry Napoli contracted with the Company through a consulting firm of iTeamSolutions, to develop various aspects of the Company's software programs. Specifically, iTeamSolutions was contracted to help develop software developer kits (SDKs) which provide the Company's e-commerce clients a sample code to connect

their website to the Company's payment processes.  That task did not involve the code at issue here, and the daily job tasks of the Napolis as employees of Plaintiff were entirely different than the functions they were tasked with when they were performing jobs on behalf of the Company through iTeamSolutions.  *See Exhibit "C."*

12.    The Company has two data centers, one in New Hampshire and one in Tampa, Florida.  The Individual Defendants all worked at the Company's Tampa facility. *See Exhibit "C."*

13.    In or about 1994, the Company hired Defendant Bullard.  Most recently, he was employed as a Product Group Manager for Orbital Gateway.   In this job capacity, Bullard researched the industry and the Company's competitors to enhance the products offered by the Company.   In doing so, he regularly interfaced with customers (both current customer and prospects), sales personnel, and developers and formulates a roadmap of goals to add to the product.  *See Exhibit "C."*

14.    In or about October 2001, Defendant Carl Napoli was hired by Plaintiff as its Orbital and Netconnect Development Manager.  *See Exhibit "C."*

15.    In or about November 2001, Defendant Jerry Napoli was hired by Plaintiff as its Orbital and Netconnect Architect and Senior Development Manager.  *See Exhibit "C."*

16.    In or about December 2008, Defendant Vickers was hired by Plaintiff as its Orbital Gateway Developer. In this capacity, Vickers' work involved meeting the goals developed by Bullard by enhancing the product, and developing and building onto the code as necessary.  Vickers' direct supervisor is Defendant Carl Napoli.  *See Exhibit "C."*

6

17.     In these positions, the Individual Defendants were given access to a significant amount of vital confidential and proprietary information, including code, the Orbital Code in particular, and proprietary, confidential, and other trade secrets of the Company.  *See Exhibit "C."*

18.     Upon information and belief, as discussed below, iTeamSolutions and the Individual Defendants have worked in concert in ways antithetical to the Company's interests.

### C.     Specific Allegations Giving Rise To This Complaint

19.     In late August 2010, Mike Nicholls, Group Executive, Retail Technology of the Tampa facility, received a report regarding suspicious activities by the Individual Defendants.  Specifically, Defendant Bullard was suspected of recruiting developers to work on a project not involving the Company, dealing with electronic medical records and payments, and Jerry Napoli was suspected of using non-authorized programs unrelated to the Company.  The Company also discovered that some of the Individual Defendants were bringing in and using personal computers at the Company's facility, in violation of the Company's policies.  Further, many of the Individual Defendants had developed irregular working hours.  *See Exhibit "C.*"

20.     The Company's internal security group and the Global Security Group investigated the allegations and concerns.  The investigation revealed that some of the Individual Defendants had installed separate, concealed wiring so as to enable them to access the Company's network on their personal computers, without knowledge or permission by the Company.  Dan Delmonte, an investigator for the Company's Global Security and Investigations, met with the Individual Defendants on September 23 and 24, 2010.  All the Individual Defendants typed and signed voluntary statements.  *See*

*attached Declaration of Dan Delmonte, at Exhibit "D," attaching true and correct copies of the Individual Defendant's statements.*

21.     Defendant Jerry Napoli admitted to using a personal laptop on Company premises.  Specifically, he admitted that he transferred the Company's source code to his personal laptop, and that he had transferred Orbital batch source code to an iTeamSolutions repository <u>and</u> to his personal laptop.  Such transfers of the Company's confidential, proprietary, and trade secret information violate Company policy; there are no legitimate reasons for them.  Defendant Jerry Napoli also admitted performing non-Company related work on his personal laptop while in the office, and he admitted to performing "side work" for iTeamSolutions during his employment.  He further admitted that he had engaged in conduct which he acknowledges was a "conflict of interest with Paymentech."  *See Exhibit "D."*

22.     Defendant Carl Napoli admitted having a personal laptop on Company premises.  He claimed that since he became a full-time employee of Plaintiff, his role in iTeamSolutions had diminished to "really nothing," leading the investigator to believe iTeamSolutions had all but ceased to exist.  However, any such inference is belied by the fact that his brother, Jerry Napoli admitted to performing iTeamSolutions work since being employed with the Company.  *See Exhibit "D."*

23.     Defendant Vickers admitted that software artifacts belonging to Plaintiff were on the iTeamSolutions server.  He also admitted to Kimberly Hurst, an Enterprise Security Analyst for the Company that he had a file drive mounted on his iPod® that contained the Company code, and that he had transmitted the code to his home.  *See attached Declaration of Kimberly Hurst, as Exhibit "E."*

24.     Defendant Bullard was not in the office on September 23, 2010, but was called via phone by Rebecca Bell (Human Resources) to come to the office and bring his laptop.  According to Bell, Bullard became panicked and repeated "oh my god, oh my god."  *See Exhibit "B."* Defendant Bullard asked if he was going to be fired, to which Bell responded that they would need to speak to him in person.  Bullard then stated "he is coming after me" and continued to repeat "oh my god, oh my god."  Bullard did not identify whom he was referring to.   Due to personal reasons, Bullard could not be interviewed on September 23, 2010, but was interviewed the following day.  *See Exhibit "D."*

25.     In the 24 hours immediately after Bullard was notified of the investigation and interview on September 23, 2010, his laptop computer recorded 23,000 system file actions,   which is multiples above expected ordinary usage.   This is indicative of deletion and/or defragmenting the computer's hard drive in an attempt to conceal or destroy evidence. *See attached Declaration of Doug Kallgren, as Exhibit "F."*

26.     Defendant Jerry Napoli had connected a keyboard, video, mouse ("KVM") switch device manufactured by IOGEAR to the Company owned laptop and had connectors wired into his overhead with a MAC computer adapter and was connected to one of his three monitors. Separately, he had a 2.0 USB VGA adapter that was plugged directly to a separate monitor and was connected to the back of his the Company owned laptop. There was also a MAC power cord wired into the overhead and a USB cable commonly used to port information between two different devices.  The wiring was well hidden and went undetected.  *See attached Declaration of Kimberly Hurst, at*

9

*Exhibit "E" attaching true and correct copies of photographs of the workstations of Defendants' Carl and Jerry Napoli.*

27.     Defendant Carl Napoli had connected an IOGEAR KVM to his the Company owned laptop and had connectors wired into his overhead. The KVM switches worked as data connections, allowing surreptitious file transfer.  Separately, he had a 2.0 USB VGA adapter that was plugged directly to a separate monitor and was connected to the back of his the Company owned laptop.  There was also a MAC power cord connected directly to his MAC laptop that was sitting on top of the desk in his cubicle with a newspaper thrown on top of it.  Defendant Carl Napoli also had his brother, Jerry Napoli's backpack with Jerry's MAC laptop, MAC iPad and multiple cords and wires.  In Defendant Carl Napoli's backpack there was an external Seagate hard drive.  *See Exhibit "E."*

28.     The added equipment and connections were not visible to the passerby. The cabling enabled Defendants Jerry Napoli and Carl Napoli to use two computers and two monitors and toggle back and forth very quickly.  It also enables them to transfer data from their Chase work computers to their personal computers undetected.  *See Exhibit "E."*

29.     Defendant Steve Vickers had an iPod® on his desk.  Steve Vickers works next to Carl Napoli.  As Steve Vickers was leaving the Tampa office on September 23, 2010, he admitted that he had mounted a file drive to his iPod®, capable of storing data.  He admitted that portions of Chase source code would be discoverable on his iPod® and that he had used it to transmit Chase code to his home.

30.     In sum, the Company's investigation to date has revealed that Defendants Carl and Jerry Napoli had placed and concealed additional wiring at their cubicles; that they had used their own personal laptops at the Company; that Jerry Napoli admitted that he had downloaded Plaintiff's code on (A) his personal laptop and (B) an iTeamSolutions repository; that Defendant Jerry Napoli admitted to outside employment by iTeamSolutions that had not been approved by the Company, and that Defendant Bullard had engaged in highly suspicious computer activity consistent with deleting or defragmentation of the Computer data after he learned of the investigation.   *See Exhibit's "D" and "E."*

31.     Each Individual Defendant was asked to execute an authorization by noon on September 28, 2010.   *See Exhibit "G."*  None of the Individual Defendants complied or met with this deadline permitting the Company to have a forensic review of their personal computers to determine the exact nature and extent of what Company-owned information had been copied, transmitted or used.

32.     On September 29, 2010, the Individual Defendants were terminated.

33.     As a direct and proximate result of Defendants' actions, the Company has been, and continues to be, damaged in an amount that is impossible to ascertain unless the Defendants are enjoined from the aforementioned conduct, including any use or distribution of the Company's confidential, proprietary and confidential information and any further efforts to conceal or destroy evidence.

34.     The Company has already suffered and will continue to suffer irreparable injury and harm to its business, and monetary damages alone are an inadequate redress for such continuing injury.

## III.   ARGUMENT

### A.   Paymentech Has Satisfied The Requirements for A Preliminary Injunction.

After proper notice and hearing, Paymentech seeks a preliminary injunction to enforce its rights to protect its confidential, trade secret, and proprietary information under to Fed. R. Civ. P. 65(b), and M. D. Fla. L.R. 4.05.  The specific conduct sought to be enjoined is listed in the prayer for relief in Plaintiff's Complaint.  M. D. Fla. L.R. 4.05(b)(3)(i).  Given the nature of Paymentech's request for injunctive relief to protect trade secrets of its own ownership, the amount of security to be posted pursuant to Fed. R. Civ. P. 65(c) should be, at most, limited to Defendants' court costs in defense of this Motion.  *Id.* at 4.05(b)(3)(ii).[1]  A proposed order accompanies this Motion.  *Id.* at 4.05(b)(3)(iii).  This Motion is supported by the following legal arguments.  *Id.* at 4.05(b)(3)(iv).

Issuing a preliminary injunction lies within the sound discretion of the district court.  *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir. 1990).  The Local Rules for the Middle District of Florida expressly incorporate the Eleventh Circuit's four-pronged standard for determining whether injunctive relief should issue.  M.D. Fla. L. R. 4.05(b)(4); *Frio Ice, S.A.*, 918 F. 2d at 159.  As discussed below, Paymentech's Motion demonstrates (1) the likelihood of success on the merits with respect to each of its claims;  (2) the irreparable nature of the threatened injury if injunctive relief is not granted; (3) that the threatened harm to Paymentech outweighs any harm that the order

---

[1]  It should be noted that Florida courts have "the discretion to issue a preliminary injunction without requiring [p]laintiffs to give security, notwithstanding the seemingly mandatory language of the rule." *Xavier Puerre Tancogne et al. v. Tomajai Enterprises Corporation*, 408 F. Supp. 2d 1237, 1252  (S.D. Fla. 2005) (citing *Univ. Books and Videos, Inc. v. Metro Dade County*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999); *Popular Bank of Fla. v. Banco Pupular de P.R.*, 180 F.R.D. 461, 463-65 (S.D. Fla. 1998); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998).

may cause Defendants; and (4) that the public interest will not be disserved by the granting of injunctive relief.  *See* M.D. Fla. L. R. 4.05(b)(4).

When a federal court sits in diversity jurisdiction, as this Court does, the court applies state law to the substantive issues of the case.  *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  In this case, Plaintiff asserts claims of misappropriation of trade secrets against all Defendants, breach of the fiduciary duty of loyalty against the Individual Defendants, and conspiracy against all Defendants.

**1.      Paymentech Will Prevail On The Merits Of Each Of Its Counts.**

**(a)      Defendants Have Misappropriated Plaintiff's Trade Secrets.**

To succeed on a claim for misappropriation of trade secrets under Florida law, a plaintiff must plead and prove (1) that the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.  *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,* 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).  The Florida Uniform Trade Secrets Act (Florida Statute § 688) ("FUTSA"), provides in part:

> (2)      "Misappropriation" means:
>
>      (a)      Acquisition of trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . .

Fla. Stat. § 688.002.

> (1)      Actual or threatened misappropriation may be enjoined.  Upon application of the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

\*        \*        \*

(3)    In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

Fla. Stat. § 688.003.

FUTSA provides that any litigant who establishes a violation of the statute has the right to obtain an injunction preventing the actual or threatened misappropriation of trade secrets. Fla. Stat. § 688.003(1); *see also Delucca v. GCL Inds., Inc.*, 712 So.2d 1186, 1187 (Fla. 4th DCA 1998); *Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 60 (Fla. 5th DCA 1995).  FUTSA defines a protectable trade secret as follows:

Information, including a formula, pattern, compilation, program, device, method, technique, or process that:  (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic valued from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. §688.002(4).

Florida courts have long recognized that a former employee may not divulge the trade secrets of his or her former employer:

Where an employee acquires, during the course of his employment, a special technique or process developed by his employer, the employee is under a duty, even in the absence of an express contractual provision, not to disclose such skills, techniques or processes in his employment for his own or another's benefit to the detriment of his previous employer.

*Lee v. Cercoa, Inc.*, 433 So.2d 1, 2 (Fla. 4th DCA 1983).  Indeed, FUTSA "illustrates [Florida's] interest in protecting businesses from the theft of confidential information." *Hatfield v. AutoNation, Inc.*, 939 So.2d 155, 158 (Fla. 4th Dist. Ct. App. 2006).

As part of its business, Paymentech has developed a sophisticated and complex source code called the Orbital Code.  The Company has invested a significant amount

of technological resources and manpower over the past decade to enhance the code, making it much more valuable. Paymentech's confidential, proprietary and trade secret information, including the code, is extremely valuable to the Company; it would likewise be valuable to competitors were it to come into their possession. *See Exhibit "A."*

Paymentech also takes significant measures to safeguard the secrecy of its confidential. The Company has strict compliance policies to protect the highly confidential and proprietary nature of its information. Access to Paymentech's computer system is password protected. The Company also mandates that only company-owned or authorized equipment may be used to store Company software and data, and that the employee's personal equipment may not be used to store Company software and data. *See Exhibit "A."*

The Individual Defendants have violated numerous Company Policies by connecting personal computers to Paymentech's network with non-sanctioned wiring, downloading highly valuable trade secret information, and engaging in computer activity consistent with the defragmentation of a drive or deletion of massive amounts of data *after* becoming aware of the investigation of these matters. *See Exhibits "B" "D" and "E."* Furthermore, Jerry Napoli and Vickers have admitted that Paymentech's data has been downloaded to iTeamSolutions' data repository. *See Exhibit "D."* In short, Defendants have engaged in unauthorized conduct resulting in the use or disclosure of Paymentech's valuable confidential, trade secret, and proprietary information through improper means. As a result, Paymentech is likely to succeed on the merits of its misappropriation of trade secrets case.

**(b) The Individual Defendants Have Breached Their Fiduciary Duties and Duty of Loyalty.**

The Individual Defendants have breached their fiduciary duty and duty of loyalty to Paymentech by acting contrary to the best interests of Paymentech during their employment.

> The general rule with regard to an employee's duty of loyalty to his employer is that an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment.   However, that employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment.

*Fish v. Adams*, 401 So.2d 843, 845 (Fla. 5th DCA 1981) (citing *Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So.2d 303 (Fla. 5th DCA 1980); see also *Liberty American Ins. Group v. Westpoint Underwriters, LLC*, 199 F.Supp.2d 1271 (M.D. Fla. 2001) (same).

Each of the Individual Defendants was an employee entrusted with highly valuable, trade secret information of Paymentech.   Each has engaged in the misappropriation, deletion, or unauthorized access of Paymentech's confidential, proprietary and trade secret information.   Moreover, to the extent that the Individual Defendants have downloaded Paymentech's information, including its code, to an iTeamSolutions repository, or allowed others to do so without advising the Company of the breach in security of its information, they have breached their fiduciary duties and duty of loyalty to the Company.

These breaches of duty have damaged   Paymentech.   Given Paymentech's business – the processing of electronic payments – the integrity of its information and computer systems is critical.   This is precisely why Paymentech maintains such strict

rules governing the acceptable methods of accessing its systems.  At the very least, Defendants' conduct has degraded the security and integrity of Plaintiff's computer system and the confidential, trade secret, and proprietary information contained on that system.  Consequently, Plaintiff is likely to succeed on the merits of its claim of breach of fiduciary duty and duty of loyalty against the Individual Defendants.

> **(c)     The Defendants Have Engaged in Conspiracy With Respect to Paymentech's Confidential, Trade Secret, and Proprietary Information.**

Under Florida law, the elements of a civil conspiracy claim are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *UTC Indus., Inc. v. Presidential Fin. Corp.*, 976 So. 2d 92, 94 (Fla. 3d DCA 2008) (citations omitted); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).  To succeed in a claim for conspiracy, a plaintiff must allege "an actionable underlying tort or wrong." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (citation omitted); see also *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 950 (Fla. 3d DCA 1984) ("The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff").

Here, numerous facts indicate that Paymentech will prevail on the merits of its civil conspiracy claim against the Defendants.  An agreement among the Defendants is evidenced by (1) the similar use of suspicious, unauthorized computer equipment by Defendants Carl and Jerry Napoli, and Defendant Vickers, (2) the affiliation of the Individual Defendants with Defendant iTeamSolutions, which Defendant Jerry Napoli admitted is engaged in active, ongoing business operations, and (3) Defendant Bullard's

mass deletion of data once he had reason to know that the investigation of their activities was underway.

With respect to the other elements of civil conspiracy, the Defendants have violated laws as discussed throughout this Motion.  The risk or reality of the dissemination of Paymentech's code, by which roughly half of all global internet transactions are processed, demonstrates extreme damage to the Company. Accordingly, Paymentech demonstrates a high likelihood of prevailing on the merits of its civil conspiracy claim.

### 2.    Paymentech Will Suffer Irreparable Harm Unless The Status Quo Is Maintained On An Emergency Basis.

Irreparable harm or injury is "the *sine qua non* of injunctive relief."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  Defendants have violated Company Policies by improperly accessing, acquiring and/or deleting Paymentech's confidential, proprietary and trade secret information.  That information, including Paymentech's code, is  extremely valuable to  Paymentech, and would be valuable in the hands of competitors.  The fact that Defendants have breached Paymentech's security protocols inflicts damage to the integrity of Paymentech, a company dedicated to the secure processing of electronic payments.  Any vulnerability (or even a perception of vulnerability) with respect to Paymentech's code and related trade secrets would critically damage the Company's business model and image of reliability and privacy in the eyes of its customer base.  The threat of irreparable harm to Paymentech should an injunction not issue is substantial, and at this point, it is insusceptible of mathematical quantification.  *See also Hatfield v. AutoNation, Inc.*, 939 So.2d 155, 157 (Fla. 4th DCA 2006) (observing that "the fact that AutoNation could only speculate on the magnitude of

the ramifications of disclosure of its secrets lends support to the irreparable nature of the harm") (citing *JonJuan Salon, Inc. v. Acosto*, 922 So.2d 1081, 1084 (4th DCA 2006) ("An injury is irreparable where the damage is estimable only by conjecture, not by any accurate standard")).

The injunctive relief requested is designed to halt the ongoing nature of the damage to Paymentech preliminary, until such time as further proceedings may be conducted to ensure that Paymentech's information that has been misappropriated by Defendants is secured.   Without such measures, Paymentech's information may be used, modified, disclosed, or destroyed by Defendants, all of which would inflict further substantial, and irreparable, harm to Plaintiff.

The facts also demonstrate the necessity for a hearing on an application for a preliminary injunction.   M. D. Fla. L.R. 4.05(b)(2), (4).   Florida courts have interpreted this standard, in connection with Florida Rule of Civil Procedure 1.610(a)(1), as follows:

> To satisfy the rule's mandate of establishing why notice should not be required, a plaintiff seeking an ex parte temporary injunction must demonstrate (1) how and why the giving of notice would accelerate or precipitate the injury or (2) that the time required to notice a hearing would actually permit the threatened irreparable injury to occur.   *Dixie Music Co. v. Pike*, 135 Fla. 671, 185 So. 441, 446 (1938); *Lieberman v. Marshall*, 236 So. 2d 120, 125 (Fla. 1970); *Minimatic Components, Inc. v. Westinghouse Elec. Corp.*, 494 So. 2d 303, 304 (Fla. 4th DCA 1986); *Shouman v. American Express Travel Related Servs. Co.*, 566 So. 2d 875 (Fla. 3d DCA 1990).   Examples of such a showing are where notice of a hearing will prompt a defendant to destroy records, cause unsecured assets to be liquidated in the context of a fraudulent enterprise, or precipitate the disposal of the major asset of a partnership subject to an accounting.

*Smith v. Knight*, 679 So.2d 359, 361-62 (Fla. 4th Dist. Ct. App. 1996).

Here, the facts indicate that, once Paymentech began its investigation and interviews of the Individual Defendants, at least one of the Individual Defendants (Jamie

Bullard) engaged in "system file actions," which indicates either software and data extraction or deletion in his anticipation of an investigation or potential termination.   In short, the precise concern of Florida courts favoring injunctive relief is evident here: destruction or misappropriation in the context of an unlawful enterprise.   In order to preserve its crucial trade secrets, Paymentech needs, on an expedited basis, discovery and recovery of the extent of information dissemination Defendants have already caused, and are likely to continue.

### 3.   The Threatened Harm To Paymentech Outweighs Any Harm That The Temporary Restraining Order May Cause Defendants.

As shown above, the injuries being sustained by Paymentech are irreparable. The only corresponding risk to Defendants is from potential lost income/profits resulting from the entry of the injunction.   Contemporaneously with this motion, Paymentech is filing a Motion for a Temporary Restraining Order.   The requirement of an injunction security bond adequately protects Defendants against any such injuries in the event the Court later determines the injunction was wrongfully entered.   *Ferrero v. Assoc. Materials, Inc.*, 923 F. 2d 1441, 1449 (11th Cir. 1991).   As noted above, however, Paymentech suggests that this Court need not require such security, given the nature of the Company's requested injunction.

The scope of the injunctive relief sought is modest.   As fully stated in Plaintiff's Complaint and Jury Demand, Paymentech seeks a preliminary injunction ordering Defendants to:  (1) return Paymentech property, (2) refrain from using, disclosing, or destroying Paymentech confidential, proprietary and trade secret information, (3) refrain from engaging in employment or consulting work that would, by its nature, involve the use or disclosure of Paymentech information, and (4) make computers and data devices

available for inspection.  This is the same type of injunctive relief ordered by the trial court and affirmed on appeal in *Hatfield v. Autonation, Inc.*, 939 So.2d 155, 156 (Fla. 4th DCA 2006).

There is no harm to Defendants in requiring that they return Paymentech property or refrain from using, disclosing, or destroying Paymentech's confidential, proprietary, and trade secret information.

With regard to the restriction prohibiting Defendants from engaging in work that would, by its nature, involve the use or disclosure of Paymentech's confidential, trade secret and proprietary information, Plaintiff has established the significant value of such information.  The risk of harm to Plaintiff should that information — including valuable code that took years to develop — be used by Defendants to compete with Plaintiff, or be accessed by a competitor, is irreparable.  If not enjoined, Defendants will be able to identify and capture the same profit opportunities as Paymentech and thereby diminish the profit potential that Paymentech's code was developed to target.  This will impair the value of Paymentech's code irreparably.  By contrast, Defendants are not prohibited from earning a living in jobs and careers that would not involve the use of the confidential, trade secret, and proprietary information they have acquired at Paymentech.  Consequently, the threatened harm to Paymentech greatly outweighs any theoretical harm to Defendants.

Finally, the requirement that Defendants produce their electronic storage devices ("ESD's") so that those devices may be studied to locate Paymentech's information (and ultimately retrieve that information) is necessary to the protection of  Paymentech. Defendants, by virtue of their activities, make this component of the injunctive relief

necessary.  Moreover, the harm to Defendants by allowing such devices to be studied is minimal, especially compared to the risk of harm to Plaintiff if its valuable information is not located and retrieved from these unauthorized devices.

Accordingly, the balance of harms involved in issuing the requested injunctive relief weighs significantly in Paymentech's favor.

### 4.    The Public Interest Favors Injunctive Relief For Paymentech.

Under the public interest factor, "the law favors active but fair competition." *Digitel Corp. v. Deltacom, Inc.*, 953 F. Supp. at 1498 (emphasis added) (quoting *Combined Ins. Co. v. Investors Consol. Ins. Co.*, 499 F. Supp. 484, 488 (E.D.N.C. 1980)).  The "existence of Florida's trade secret statute illustrates [Florida's] interest in protecting businesses from theft of confidential information."  *Hatfield*, 939 So.2d 155, 158. Therefore, the public interest — as expressed in applicable Florida statutes — also favors Paymentech's right to injunctive relief.

## IV.    CONCLUSION/PRAYER FOR RELIEF

WHEREFORE, Paymentech requests that the Court issue a preliminary injunction, after notice and hearing, in favor of Paymentech and against Defendants.

Respectfully submitted,


*/s/ Courtney B. Wilson*
Courtney B. Wilson
Florida Bar No. 614580
LITTLER MENDELSON, P.C.
Suite 1500 - One Biscayne Tower
2 S. Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 400-7500
Facsimile:  (305) 603-2552
E-Mail:  cwilson@littler.com

AND

LITTLER MENDELSON, P.C.
Suite 1500, Lock Box 116
2001 Ross Avenue
Dallas, TX  75201-2931
Telephone:  (214) 880-8100
Facsimile:  (214) 880-0181

Harold D. Jones, Esquire
E-Mail:  hdjones@littler.com
(*Appearing Pro Hac Vice*)

Ryan Griffitts, Esquire
E-Mail:  rgriffitts@littler.com
(*Appearing Pro Hac Vice*)

Jeremy W. Hawpe
E-Mail:  jhawpe@littler.com
(*Appearing Pro Hac Vice*)

**COUNSEL FOR PLAINTIFF
PAYMENTECH, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of October, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the CM/ECF participants identified below.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/ECF participants identified at the time of electronic filing.

/s/ Courtney B. Wilson
COURTNEY B. WILSON

Firmwide:97786784.1 065834.1000